,Joseph Lube, on behalf of the appellant, Richard Laird. And today I'd like to reserve three minutes of my time, if I may. Your Honors, in this case there are two broad categories of evidence the trial counsel failed to develop, in which left the jury materially uninformed about Mr. Laird and the offense. First, counsel failed to capture the severe and ongoing sexual abuse that Mr. Laird suffered as a child. And second, counsel failed to connect that abuse and its aftermath to the murder in question, which by any measure was a gruesome hate crime. I should say at the outset that there's no sense in which the evidence that I'll be discussing today was cumulative of what was presented at trial. And indeed, the State Court's conclusion to that effect was objectively unreasonable under Ed Pye, as I will explain later. So, Mr. Laird, a question for you before you go down that road. Of course. There's the testimony of Dr. Lysak, and there's the affidavit of Dr. Lysak. Well, his report. His report, which as I understand was not admitted into evidence to the PCRA. Is that correct? That's correct. Can we consider that affidavit? Yes. The main reason that you can consider it is because at the outset it's essentially the same evidence and the claims that are advanced both in the affidavit and in the testimony are the same. There really is no substantive difference. But even if there were, the court could still consider the affidavit because it was submitted to the trial court and the trial court simply declined to admit it into evidence. It was filed in the PCRA court in March of 2012. So far as I know, it ought to be in the boxes of the State Court record that the district court sent up to hear. It's in the box, but the judge did not admit it into evidence. That's correct. And under Section 2254D2, the question is whether the State Court's findings are objectively unreasonable in light of the evidence that was presented to the State Court. This evidence was, in fact, presented to the State Court. The court was made aware of the report. Dr. Lysak described the report from the witness stand. Doesn't that stretch the word presented a bit beyond our jurisprudence? I don't think so, Your Honor. I'm not aware of any case that puts the defendant-slash-petitioner at jeopardy because of the trial court's decision to only consider the testimony of an expert instead of the report. In any event, as to the abuse itself, the evidence here is that Mr. Laird was routinely raped by his own father, both orally and anally, from the age of five until the age of 11. To this date, Mr. Laird experiences flashbacks to the experience of severe rectal pain. He still suffers involuntary gag reflexes that trace back to the sensory experience of his father ejaculating into his mouth. There's certainly a dispute, to be sure in this case, about how much of this evidence was described at trial. And Your Honors may have noticed that the district court, on the one hand, says that the trial merely described a single incident of potential abuse. The Commonwealth insists, no, no, it describes multiple incidents of repeated abuse. But the dispute itself proves our point, Your Honors. The dispute itself proves that trial counsel failed because he presented the sexual abuse as a, and I will quote, an uncommon instead of a dominant feature of Mr. Laird's childhood. That quote is from this court's opinion in the Opulence Salon case. The second missing piece here, aside from the abuse, was the aftermath of the abuse. As Dr. Lisak testified, and one needn't refer to his report, Your Honor, that Mr. Laird was severely traumatized, that that effect is enormously magnified when the perpetrator is one's parent, and that this kind of abuse brings about a tremendous stress that is unresolvable. And specifically, young men in particular tend to internalize this kind of abuse. They suffer from a sense of worthlessness and vulnerability. And that is why we see the development of. Mr. Luby. Yes, sir. You know, at least speaking for myself, I think I understand your argument. I understand the point that you're trying to make on behalf of Mr. Laird, and I commend you for that. But we're sitting here in habeas. We're sitting here in habeas, and we're being asked to review what the state courts did. Okay. So before we get into too many more of the facts, because I think we, at least I know the facts. I'm sure my colleagues understand the facts. I'm particularly interested in, I know, we know the deference that Strickland versus Washington gives to the decisions of trial counsel. But what I'd like to know from you is what deference do we owe first on the performance prong and secondly on the prejudice prong? On the performance prong, Your Honor, our argument would be that no particular differences do because there isn't an actual state court adjudication of. Why wasn't the PCRA court's review of that an adequate adjudication? That is because if Your Honor looks closely at the Pennsylvania Supreme Court's discussion of the 1925 opinion from the PCRA court, the court says, well, we're not so sure about this idea that Dr. Leasack's evidence was insignificant. And you may recall that the PCRA court ruled that counsel was not ineffective for declining to present this insignificant additional evidence. So the Pennsylvania Supreme Court said. The Supreme Court skipped over that, and they went right to the prejudice prong. I would, with respect, Your Honor, I would say they didn't skip over it. I think they called it into question and then went to the prejudice prong. And indeed, that may be why the district court in this case did not exercise. Sounds a little bit like the deference we owe to a summary affirmance from Harrington versus Richter. So, but anyways, go ahead. Well, and I. Can I just follow up? So are you saying it's de novo, or are you saying it's ad pedeference on performance prong? On performance, my argument, Your Honor, is that it is de novo because the Pennsylvania Supreme Court's argument, our rationale called into question the PCRA court's ruling that very obliquely addressed the question of performance. Why wasn't since the. You're saying they an oblique using the word oblique, maybe a kind description of it. If they skipped over it and they went right to the prejudice prong, which I view it as, it takes us back to the PCRA court. And there are cases that tell us that we can review the decisions of different courts when we're sitting in habeas. Without question. On different claims.  So if we go back to the PCRA court, if that's what we're reviewing, what level of deference do we owe to that? Well, yes. And obviously, I quibble with Your Honor's premise that there was an actual adjudication. Because I'm for an answer. Right. Right. So obviously, if that is the state court adjudication, then yes, of course, it would be reviewed deferentially under Section 2254 D1 and D2. All right. So you would. And then let's go to the prejudice prong. What deference do we owe to the decision of the Pennsylvania Supreme Court on the prejudice prong? And that question is also subject to epidefference.  Yes, because the Pennsylvania Supreme Court made an express ruling that the evidence here was largely cumulative of the trial evidence. And we're dealing with Strickland v. Washington. Yes. And as the Supreme Court has said a number of times, you have a standard that you have to overcome, which is doubly deferential. Do you agree with that? Only to the degree that the court is deferring both the trial counsel's performance and to the state court's rendering thereof. And again, I think Your Honor and I perhaps are not on the same page on that question. We'll give you an asterisk on your answer. We'll give you an asterisk on your answer. Fair enough. Do you agree with doubly deferential? Subject to the asterisk, yes. OK. All right. How do you win? Even under double deference, Your Honor, if there were such a thing in this case, which there isn't, the court is still required to review the totality of circumstances from the perspective of trial counsel at the time. Wiggins teaches us that we consider not only the amount of information known and discovered by counsel, but that we also examine whether a reasonable attorney armed with that knowledge would have continued investigating. And I'd like to review, if I may, what it is that trial counsel knew. Armed with what knowledge? Excuse me, sir? Armed with what knowledge? Armed with the knowledge that they had going into the case based on their investigation. So, you know, I'm kind of, this is an interesting one for me because counsel had two experts. Yeah, I think it's Dee and Fox. There's a third one floating around, Silverman, who probably wasn't too helpful at all. And so he's already looking into mental health experts. And it seems that for there to be deficient performance, we have to have a rule that would say, two experts who are mental health professionals familiar with child abuse, child sexual abuse, isn't good enough. That's deficient performance. You have to get a third expert who's just better and more of a specialist than the other two. That might be best practices. We could write a book on best practices, and that might be best practices. But for you to win, as I understand it, you can't just say this would have been best practices. You have to say, after you already had two experts, neither of which was particularly great, maybe that's part of it. Silverman's not good at all, really, for your client's case. And so you sit there and say, hey, this might be a dead end. I've heard from three professionals in the area. No one's really, really, really helping my case. Maybe it makes sense to turn to other mitigating evidence to try to make my case there instead of try to get, depending on how you count, a third or a fourth expert. Why is that not a strategic decision, but instead deficient performance? I would say, Your Honor, that there is no rule under Strickland, under Wiggins, under any other case. There is no rule that dictates the number of experts that a defense attorney must have. The question is always, what does the attorney do with the knowledge he has at the time? I would refer, Your Honor, to the Ronpilla case. There, counsel had, in the language of the Supreme Court, a cadre of three mental health experts. And despite having those experts, counsel was nevertheless objectively deficient, because counsel didn't follow up on the lead that was available to them in the form of the defendant's prior conviction, which revealed a history of schizophrenia and other mental health. In all of those cases, counselor, weren't those examples where there were other records out there that would show the issue in question, in this case of sexual abuse?  Here, there were no other experts. The information that counsel, you're saying counsel had an obligation to get through another expert, was information that only Larry had himself. Yes, but if I may trace this out a little bit, for Your Honor, so that we can see what counsel knew and what they might have done differently.  Counsel knew that there was evidence that Mr. Laird had been sexually abused, and they viewed it as an allegation. Counsel knew that sexual abuse victims are often reticent to come forward and provide the details. We know that, because counsel argued it to the jury. They said sexual abuse victims tend to hide what they've suffered. Counsel knew, from speaking with Mr. Laird. Let me stop you right there. Yes. Does that have any, does that carry any weight, his argument to the jury? I mean, this wasn't done in a vacuum by Mr. Williams. Williams had his experts, and then he argued the issue to the jury. It carries weight to the degree that it's supported by evidence, and in this case it wasn't supported by evidence of the extensive abuse, A, and B of the consequences. It sounds to me like it was presented. It sounds to me like it was at least presented to the jury. Without question. There are lots of cases where prejudice can be found because the presentation was threadbare compared to what was available to counsel. I'd refer, Your Honor, again to the Abdul Salam case as well as the Outen case. Isn't what was available to counsel based on what your client was willing to tell counsel? Absolutely, but, Your Honor, with respect, that's the whole point, because counsel knew they weren't getting the whole story from Mr. Laird. How did they know they weren't getting the whole story prior to engaging LESIC? Because that's what they testified to at the PCRA hearing. Who testified to it? Both of the attorneys did. The only person who didn't testify, not that he had any obligation to testify, Laird never testified. That's correct, Your Honor. Okay. How do we know Laird didn't make this all up in the intervening five years? Well, Dr. LESIC, as an expert in sexual abuse, has been able to corroborate what Laird has told him with other events of Mr. Laird's life. Obviously, if there's some allegation of fabrication, the Commonwealth will be free to argue that to a jury. But I don't think it's a question here that prevents the claim from going forward. But, you know, I guess, I'm sure counsel already had a neuropsychologist and a psychiatrist retained as experts. And so, like, if they can't get any more and they aren't saying, hey, you might want to get a subspecialist or somebody else like this, we're going to say, gee, this isn't like the first goal. This isn't like 1988 where it's like, hear from my live-in girlfriend. This is a very, very, very different time. In fact, these two witnesses are the reason it's their testimony that Laird won, I think, his first collateral review proceeding. You say, hey, look, they show that you should have had some expert in this regard. Counsel then says, hey, those two guys that said you should have had an expert, I like them. I'd like them to be my experts this go-around. And now the answer is the guys that said you should have done more the first time, who'd already displayed a fact that they could identify deficiencies in a trial strategy. He can't rely on them for planning a new trial strategy? They somehow become relying on them now somehow is deficient performance? Yes, Your Honor. There are two reasons that counsel cannot reasonably rely on them under the circumstances. The first is that counsel himself did not have the information from Mr. Laird. Counsel themselves made a record of the fact that their visits in Bucks County were not confidential, that guards were there present during their consultations as a matter of common sense. There's no way that somebody will sit there and divulge sexual abuse under those circumstances. If counsel don't have the evidence, then their experts don't either. And secondly, counsel waited until well into the 11th hour to bring Drs. Dee and Fox into the picture. It had been 10 years since those men had testified at the post-conviction hearing, and Dr. Dee came in the morning of his testimony and spent 30 minutes with Mr. Laird. Wait a minute. I know you're on the roll there, and that's great. But weren't both Dr. Fox and Dr. Dee out of state?  I'm sorry, sir. Weren't both doctors out of state? Yes, they were. Okay. So to say that they brought them in at the last minute, that's not an accurate depiction of what the record shows. Counsel was in communication with them telephonically in preparation for the trial. Correct. But counsel waited until well into the 11th hour to present them with Mr. Laird. They hadn't seen him in the last decade, and to simply see Mr. Laird when there's something new, that is sexual abuse, and he spends half an hour with this neuropsychologist on the morning of his testimony, it's not terribly surprising that after those consultations, the defense still doesn't have a very clear conception of the comprehensive nature of the abuse here or its effects. Isn't it conjecture to try to say that if there was more time or if there were more experts, Laird would have said more in 2007? I don't think it's conjecture for two reasons, Your Honor. Dr. Lisak testified that it is, in a quote, extremely likely that Mr. Laird would have disclosed the same events in 2012 or in 2007 that he divulged in 2012. He used different techniques, did he? No. The reason why is that he testified that he visited with Mr. Laird twice at the prison, and the visit was confidential. It was behind a door. No one else could hear, and under those circumstances, Mr. Laird was willing to disclose what he would disclose. We know that counsel themselves thought that their consultations with Mr. Laird were inadequate because they made a record of that fact at the time of trial and then testified to it again on PCRA. What do you make of the argument out there that given that the jury rejected these two experts during the guilt phase, the third expert should have been brought in for the penalty phase? Well, I don't think they entirely rejected it because they did find some mitigation. Yes, and among the mitigation was that the defendant was substantially impaired in his ability to understand the requirements of law and to perform his conduct, which is a response to at least Dr. D's testimony concerning Mr. Laird's organic brain damage. So you're not pursuing that argument? Well, that's not part of the claim that's been certified, is that counsel were deficient for not presenting adequate evidence of the effects of Mr. Laird's sexual abuse. The problem, and perhaps this hasn't been made clear, if so I apologize, the problem is not first and foremost counsel choosing expert C instead of expert A and B. It is failing to discover the evidence in the first place and then to provide it to any expert, whether it be A, B, or C. My time has long since expired. Go ahead. Yeah, I thought that the whole point was that this evidence can only be elicited by an expert. Well, Dr. Lisak testifies at PCRA that lawyers can bring out this kind of evidence. But it almost feels like now we're saying it's deficient performance because the lawyer isn't trained in childhood male sexual abuse so that he could have the type of conversation that would let that happen. Not at all, Your Honor. I am measuring counsel by his own standard. Counsel himself said that the circumstances here of our visits are not confidential. This is a problem. We need to do something about it. But counsel accepted as a condition of his appointment that he wouldn't have to travel to western Pennsylvania to see Mr. Laird at SCI Green. And even after the local visitation situation was unsatisfactory by counsel's own judgment, he still kept to the letter of that agreement and they still refused to see Mr. Laird in the prison where they could have had confidential discussions about these matters. And I see again that I am out of time. So thank you, Your Honors. Is it Fegley? Yes. Good afternoon, Your Honors. John Fegley from the Bucks County District Attorney's Office on behalf of the Secretary of Department of Corrections for Pennsylvania. On the issue of deficient performance, attorneys every day have to make decisions on where they're going to allocate their time and where they're going to allocate their resources. And when their own client withholds information from them and they deem it prudent to send resources and time in other directions, that's not deficient performance. That's a reasonable strategy. In the case law, in regards to mitigating circumstances for death penalty cases, when they discuss or when the clients are not participating or they're obstructing, the case law does not say you should have hired more experts to stop their obstruction or to dive deeper. It says you should have went to the other avenues, the other available records, and looked for information in other manners. So here, Attorney Williams and Attorney Kerrigan had, as was pointed out, two experts who were trained in the relevant fields. They analyzed the defendant. They interviewed him. They gave reports. And none of those reports said, hey, another expert should interview him and maybe they'll pull out more information. And the attorneys were entitled to rely on those experts. Does the record show whether Attorney Williams ever asked the experts as to whether an expert on sexual abuse may have been helpful? I know that there is testimony from Attorney Williams that he had no reason to believe, through their discussions, that any further experts would have been probative and that he also just, through the discussions with them, it never came up, it never came to mind that another expert would have. So I believe that would cover the basis. I don't think they ever brought out did you specifically ask them with somebody else, but through the general discussions of that testimony, it appears that he reviewed their opinions with them and nobody mentioned to find another expert in that regard. How would you categorize Leasek's testimony? In a broad painting or a specific question? So in a broad painting, it is an individual who had five years later, after he's interviewing a subject who is incarcerated, who is subject to more classes, as Mr. Laird's brother testified that he learned through prison on how to cope and how to talk more about this abuse. So he had five years later, no longer in the throes of planning for a death penalty trial and even talking about the guilt phase. So he's no longer under those pressures. He's five years later. He's got all the time in the world for him while he's preparing for PCRA with no impending duties. And ultimately he has only one motivation at that point now, is to come forth and tell more stories because we're here to try to overturn the death penalty and we learned I didn't come forward with this information before and I got the death penalty. So he's interviewing an individual who's got a lot more rehabilitation under his belt and more motive to come forward now that his prior defense had failed. And then Dr. Lysak's testimony, or Lysak, I'm not exactly sure how to pronounce it either, when he tries to connect the abuse to the facts of the crime, he actually disengages. The opinion that was brought out at the original trial was that there was the smoldering antagonism towards those perceived as homosexuals and that's why he picked on Mr. Milano at the bar. Dr. Lysak's testimony said that he has a longstanding aversion to even being touched by another man, which was completely contradicted by the facts set out in the guilt phase. And when confronted with this at the PCRA hearing, his only explanation was, well, petitioner, he didn't remember anything so I didn't ask him about that discrepancy. So his connection of the abuse and the trauma that came from that actually should have had him acting in an entirely different manner than he actually acted. Dr. Dees and Fox's explanation at the PCRA hearing did describe abuse. They called it systemic trauma from sustained abuse and detailed why he acted in this violent manner towards the individual he perceived as homosexual. So Dr. Lysak's testimony would actually have undercut any explanation for the crimes. But to that end, diving to prejudice then, there's more to talk about that. The doctors at the sentencing hearing did talk about abuse. And while they didn't level out each individual anecdote, they talked about broad-scale systemic trauma, things that would always happen. They didn't talk about one single specific instance. They talked in common language of saying this would always happen. The brother described this would happen. And then they talked again, I can't say systemic enough because that doesn't say one discrete instance. That's repeated abuse. And then they opined again, drawing it to the reason for the action. Do you think if they knew some of the details that Dr. Lysak elicited, that their testimony would have been stronger? I think they could have brought out a couple more anecdotes. I don't think it would have changed their opinion. I don't think it would have changed their description of the abuse that was suffered or on how they connected the trauma to what he was undergoing at the time. But if those events came out perhaps in an opinion by someone like Dr. Lysak, do you think that it could be, you know, I think the standard is reasonable probability that a jury would say, wait, that mitigating factor, child sexual abuse, that at least one of us finds, might start to attract more votes and that we can balance that against the lone aggravating factor of kidnapping? I don't believe so. In particular, the standard of review we're in here, I don't believe so, under the deferential standard. Particularly, this was very similar facts under Bobby V. Van Hook, where there the additional evidence was that the sister would have testified as to multiple beatings the defendant suffered at the hands of the father and the father actually trying to kill the mother. And the Supreme Court there held that the jury heard that there was at least one instance of violence from the father and that he had violent acts towards the mother and that because of that, no one can show that it would have made a difference. I mean, those are alarmingly similar facts here where it's all right, they might have only heard one anecdote at trial and you're dropping a couple more instances, but they did hear it, they did find it. Just piling on at that matter isn't going to sway the jury, particularly when they found eight total mitigators and still found that the one aggravating factor outweighed the eight mitigators. Mr. Fegley, I'd like to direct you to the questions I ask counsel for Mr. Laird about our standard of review here. First on the performance prong. Which court's decision do we review and what level of deference do we give on a performance prong? So, again, the Supreme Court did not address the performance prong. The trial court addressed it briefly in discussing how the attorney was acting reasonably and not pursuing additional evidence because you can always find a new expert who can come in. That would be the last reasoned opinion. I did not write the brief in that matter, and I don't think the brief articulated that you can address the last reasons opinion under AEDPA deference. But the case law is clear that if it's not addressed by the higher court, you can look to the underlying last reasoned opinion and give that deference as well. And what about the prejudice prong? Which court's decision do we review and under what level of deference? Prejudice prong would be under the doubly deferential standard, so the Strickland deference that the Pennsylvania Supreme Court gave to counsel and then this court giving deference of no reasonable jurist to the Pennsylvania Supreme Court. And under that doubly deferential standard, it is the petitioner's burden to point to case law from the United States Supreme Court that has materially indistinguishable facts, and yet the Supreme Court disregarded it and went the other way. That cannot be done here. What can be done is pointing to Wong v. Belamontes and Bowie v. Van Hook, where it's directly on point for the prejudice prong, where it's here's evidence you put forth, there was a finding of these mitigators, and you're just adding a couple additional factors to those mitigators. And the Supreme Court there found there was no prejudice and it hasn't been established under the deferential review. So there are two cases that are factually indistinguishable on the prejudice prong that align with the Supreme Court's decision. I think that counsel for Mr. Laird has argued, or would argue at least in their brief, that on the prejudice prong, that Dr. Ilasek's testimony, if it existed in 2007, would not have been cumulative. They did argue that. I would argue they are wrong in that argument. Do you say it would have been cumulative if it had been available and given? It would have been cumulative to the overall evidence presented. It would have been a couple additional pieces of stories, but it would have been cumulative to the entire nature of the mitigating factor of sexual abuse suffered. Would it have been an upgrade? I'm sorry? Would it have been an upgrade? It would have been additional. What the jury did with it, I can't speculate. But under the present case law from the United States Supreme Court, they have held under indistinguishable circumstances that it can't be shown that it would have made a difference. I mean, I think the Pennsylvania Supreme Court's phrase was largely cumulative, not just entirely cumulative. And so can't we just sit there and say, hey, look, these details matter in persuasion, and these are real details that are, they both, it's not sexual abuse by father in the abstract. It walks through age at the time, type of abuse and graphic detail, number of times of abuse. We aren't just, you know, this isn't just a, you know, not tell you, so one time's not bad, but each one of those feels like it's a different axis that begins to move up. You say, hey, I've now filled in graphic details of the types of abuse. I've now filled in volume of abuse, and I've now filled in age at the time of abuse. Those all matter a lot, I think, or at least could be viewed as reasonably mattering a lot. And so to say that it's largely cumulative, none of those three axes, as I'm identifying, were really put forth before. And so it does strike me that maybe one juror would say, you know, and we don't know if it was one or 11, do we, that found sexual abuse to be mitigated. Maybe it was only one holdout on that. I don't know that deference means you get to assume 11 as opposed to 1, but we don't know that. And so when we want to say is there a reasonable likelihood of a different outcome, I'm counting three axes where it gets pretty persuasive pretty fast, I think. Well, the jury did hear that it was multiple times. They did hear the nature of the abuse, and they also heard the fact that the father would follow it up by scolding him for acting in such behavior and telling him to go wash his mouth out and things like that. And it was described, again, as systemic. It's not like the jury believed this happened once. While the doctors at the sentencing phase couldn't say X number of times at X age, they did describe it as pervasive, and the brother did describe it as something he would view as well. So I think the idea at the district court held that there was one single specific incident doesn't accurately reflect the testimony that they did perceive. So just changing that testimony, which was described as ongoing, long, pervasive abuse. Systemic. I'm trying not to say the same word over and over again. Just describing it in here's a specific number of times, I don't think substantively sways the pendulum in any one direction when it is described as ongoing through his life up until the father moved out, or they moved out of the father's residence. A decision from our court, Abdul Salaam versus the secretary. We held that prejudice may be shown when, but for counsel's errors, evidence could have been introduced that was upgraded dramatically in quality and quantity, even where the evidence supports the same mitigating factor pursued at trial. How do you distinguish this case from the position that you take? I believe the case in Abdul Salaam described that the jury heard almost nothing of the abuse. It was briefly glossed over, and then it was brought out in much greater detail once the records were brought forth. Here, you can't say that they hardly heard anything. They heard of a great deal of physical abuse from both the brother and the experts. They heard how it affected him. They heard the psychological results from that. I don't believe that was the case in Abdul Salaam. At least that's not how the court described it when they issued their opinion. What we have here is, again, we do have a good description of the abusive nature of his childhood, both from the brother and the experts, and how it impacted him. What we're adding here is just anecdotal descriptors of what specifically happened. What about the connection to the murder? I think your opposing counsel says, in addition to that, there wasn't enough connecting the abuse and its nature to the murder itself. Do you think that Leaseac would add, I think as Judge Restrepo said, an upgrade, the Abdul Salaam term, in that respect? I think Dr. Leaseac's opinion detracts from the description. What Dr. Dee opined to did draw a direct connection of the abuse suffered toward the smoldering antagonism towards those perceived as homosexual, and he described that's why he likely attached on to Mr. Milano on that evening. Mr. Leaseac's testimony describes what should have happened as he has an aversion to being touched. He can't even get his hair cut by a male barber. And there was no touching from Mr. Milano. Mr. Laird danced openly with Mr. Chester in front of him to taunt him. So all the descriptors that Mr. Leaseac had in trying to connect the trauma and the abuse and what he was going through mentally should have had him acting in an entirely different manner that night and not going after Mr. Milano, taunting him, and dancing with his friend Mr. Chester. So I think that that description is actually a downgrade from what the jury heard at the sentencing phase. Because it contradicts the facts. It does. And again, Mr. Leaseac was confronted with that cross-examination and had no explanation for it other than Mr. Laird couldn't remember the facts and I didn't question him on it. Thank you. Thank you. Mr. Lee, why don't you start with the argument that there was a disconnect with respect to Leaseac's testimony and his reaction to the, that he would not have reacted the way he did. Yeah, and I think the Commonwealth misunderstands Dr. Leaseac's testimony. The point here isn't that Mr. Laird rationally perceived Anthony Milano as a threat to his physical safety or rationally perceived that Mr. Milano was going to touch him. Quite to the contrary, Your Honor. Mr. Laird had a lifelong fear and hatred of gay men as a result of his reaction, really, to the child abuse. And indeed, one of the things that Mr. Laird said that evening was, these people are infiltrating us. So in other words, there is an altogether irrational means through which Mr. Laird was perceiving the victim and it is made more irrational still by the fact that he's severely intoxicated that night and also by the brain damage that was described. I think that Commonwealth counsel was getting at the fact that Leaseac might have testified that Laird couldn't stand being touched by men, couldn't even get his hair cut by a man, yet we have facts that he, I think, slow danced with Chester at the bar. And so if Leaseac is going to testify in full form to the point that he, that Laird can't stand being touched by men, can't even stand to get his hair cut by men, doesn't Leaseac wind up being undercut by the fact that Laird and Chester slow danced together at the bar? No, Your Honor. What Leaseac said in his testimony and in his report is that this crime could be explained by Mr. Laird acting out of concern and fear of how he perceived the victim. And by perceiving, he says, he said words to the effect of involuntary male-on-male touch, not just any male-on-male touch. Now, the fact that he's slow dancing with Mr. Chester is unremarkable because they're both out there making homophobic remarks before any of this happens. So there's very much a sort of an us-against-them sort of thing going on. And there isn't any indication, there's no sense in which Mr. Laird's conduct with Mr. Chester would be undermined or would contradict Dr. Leaseac. I guess what I'm saying is couldn't a reasonable juror say, wait, I don't really trust Leaseac anymore. He said that Laird doesn't like being touched by men and Laird's slow dancing with Chester. Couldn't a reasonable juror just say, doesn't move the dial for him anymore. That's just, I can't reconcile those two. And you've got to show a reasonable probability. And if a reasonable juror couldn't reconcile those two, how do you get to reasonable probability? I mean, you don't make sure that one reasonable juror might have reconciled those two. Any reasonable juror. The standard of prejudice is whether there's a reasonable probability that one or more jurors would have chosen a life sentence. And certainly, just as a reasonable juror, I suppose, could conceivably choose not to accept Dr. Leaseac's testimony, a reasonable juror might not be hung up on the fact that there's, you know, Okay. I'm talking about reasonable jurors.  And staying on that prejudice prong a second. How can you say that no fair-minded judges would disagree on the outcome or on the decision that was made by the Pennsylvania Supreme Court on prejudice? There are two respects in which I would make that argument, Your Honor. I don't want to belabor the first one, because I argued it before, which is that there simply is no sense in which the evidence we've been discussing this afternoon is actually cumulative of the trial testimony. It goes far beyond the trial testimony in terms of what was described. And especially, I guess, there is that fourth aspect, the effects of what was described. So you have to argue that no judges would disagree with that argument. I would have to establish that that is an objectively unreasonable reading of an unreasonable interpretation of the facts in light of the evidence that was presented in the state court record under Section D2. No judges would disagree on it. That goes more to the other. No fair-minded judges would disagree on it.  And that goes more to the other type of unreasonability, which is legal unreasonability. And that's really the second respect that's discussed in the briefing. And specifically, the argument would be that the Pennsylvania Supreme Court unreasonably applied Supreme Court presidents, specifically Williams v. Taylor, Strickland v. Washington, and a host of cases require reviewing court to consider the totality of mitigating evidence, both from trial and from post-conviction, and to weigh it against all of the aggravating evidence. And a straightforward example of when a state court failed to do that is the Outen case decided by this court in 2004. And in that case, the court said, well, yeah, we noticed that the Pennsylvania Supreme Court said that the jury had heard that Outen was abused as a child. But that doesn't mean that the jury had a comprehensive understanding of the abuse. The jurors didn't know about this ongoing. But that case also involved not acquiring available records to support the proposition. And I would argue that this case involves that, too, in the form of Dr. The only records that were available that weren't acquired were records within the possession of Mr. Laird, who wouldn't give up the information. And I think if counsel, the argument, Your Honor, that if counsel had taken professionally reasonable measures to meet with Mr. then it is likely that they would have elicited the evidence in question and would have shared it with their expert. Okay. Thank you, counsel. Thank you, Your Honor. We want to thank all counsel for their briefs and their argument. We're also going to ask that counsel speak to the clerk about ordering the transcript in this argument. And we'll ask you to split the costs. Thank you, Your Honor. Thank you. Please rise. Thank you.